Milk Producers Association of Central California, a corporation v. Commissioner.
Milk Producers Assn. of Cent. California v. Commissioner
Docket No. 575.
United States Tax Court
1944 Tax Ct. Memo LEXIS 186; 3 T.C.M. (CCH) 679; T.C.M. (RIA) 44227; July 14, 1944
*186 W. G. Harmon, Esq., 206 Sansome St., San Francisco, Calif., for the petitioner. A. L. Murray, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income and excess profits taxes against Milk Producers Association of Central California for the years and in the amounts stated as follows: Excess
Year
Income Tax
Profits Tax
1925
$ 9,256.13
1926
7,677.22
1928
6,428.53
1929
1,385.23
1931
2,598.81
1934
8,736.20
$ 2,933.19
1935
6,960.84
1,739.52
1936
15,320.01
6,326.78
1938
503.62
378.95
1939
19,682.30
13,637.35
The sole issue is whether the petitioner is taxable upon the profits realized from the sale of produce furnished to it by its members. The petitioner contends that it is entitled to exclude these profits from its income upon the ground that they were not its income, but that of its members, or, in the alternative, that it is entitled to deduct them from its income as a part of the cost of sales. The petitioner has paid the taxes due on the profits arising from the sale of produce furnished by non-member producers, and there is no issue in regard to them. The correctness of certain *187 adjustments has been conceded by the petitioner, and a subordinate issue relating to depreciation for the year 1929 has been settled by the parties, effect to all of which will be given under Rule 50. Findings of Fact The petitioner is a corporation organized in April 1917, under Title XXII, Part IV, Division I of the Civil Code of California, entitled "Non-Profit Co-Operative Corporations." Its principal place of business is at Modesto, California, with plants also located at Stockton, California, and Fallon, Nevada. Its returns for the years in controversy were filed with the Collector of Internal Revenue for the first district of California. Title XXII, under which the petitioner was organized, provided that a corporation organized thereunder "shall not issue capital stock, but shall issue a membership certificate to each member. Its business shall not be carried on for profit." Such a corporation was given "the powers granted by the provisions of this code and other laws of California, relating to private corporations, which are not inconsistent with those granted by this title * * *." In 1931, this title was repealed, and by the terms of the repealing statute "all nonprofit *188 cooperative corporations organized and existing under and by virtue of said title twenty-two are to be deemed organized and existing under and by virtue of the general corporation law of the State of California." The petitioner's articles of incorporation provide that it is organized "To furnish the facilities and agencies through which such bona fide milk producers shall market their milk, cream, butter, cheese and other dairy products upon a uniform plan * * *." Under section 2 (j) of its articles, the petitioner is authorized "To engage in the production, manufacture, marketing, distribution, shipping, storing and sale of any agricultural or horticultural produce, especially dairy products and dairy by-products." Section 2 (K) of the articles provides in part: "All of these purposes are in accord with the general idea that this Association is organized for the purpose of mutual help, without capital stock, to serve its members only and to provide all of its facilities to them at cost, pro rated according to volume and value of business done, upon uniform rules and regulations to be prescribed by the directors of the Association." The preamble to the petitioner's by-laws recites *189 that it is "a co-operative non-profit corporation, without capital stock and not conducted for profit * * *." Article XII (a) of the bylaws provides: "This Association is organized for purposes of mutual help, without capital stock and for the purpose of serving its members only and providing all of its facilities to them at cost, pro rated according to volume and value of business done by its members, upon uniform rules and regulations to be prescribed by the board of directors of the Association." The by-laws also provide that the Association "may from time to time deduct from any proceeds received by it for milk or other dairy products belonging to a member, the appropriate amount of such member's pro rated part of the total annual Association expense." All expenses and contributions are to be adjusted at the end of the year's business. The by-laws further provide that "All contracts for the sale of a member's milk and dairy products shall be made by and in the name of the Association for and on behalf each and every member * * *." Article III, section 1 of the by-laws provides: "The corporate powers, business and property of the Association shall be exercised, conducted and *190 controlled by a board of directors * * *." Membership in the petitioner is restricted to "bona fide" milk producers, and is composed of dairy farmers with small herds averaging from 9 to 10 cows per herd. Each member is entitled to one vote. His interest in the property of the Association is proportionate to the amount of his membership fee. A membership certificate is issued upon the payment of the membership fee and the signing of a member's contract. The membership fee had originally been fixed at the rate of $5.00 per cow with a minimum of $50.00 per member, but during all the times herein material it was at the rate of 50 cents per cow. These fees have been entirely inadequate to finance the petitioner's needs and have barely covered the cost of soliciting members. The member's contract provides inter alia that the member ratifies and adopts the articles and by-laws and agrees to be bound by any amendments thereto and "to turn over and deliver to the Association all of his milk, cream, butter, cheese and other dairy products, to be handled by the Association for him in the manner and as provided for in such articles * * *." A violation of this provision of the contract by *191 the member results in an immediate cancellation of his membership, together with all his rights, title and interest in the petitioner. This provision has been enforced only three times during the entire period here in question. Such violation also obligates the member to pay to the Association on demand the amounts specified in the by-laws as liquidated damages. The latter provision has never been enforced. The petitioner receives from its members and from some non-members, as hereinafter noted, whole milk and cream which it processes and sells. It does not buy the milk or cream from the producers at any stated price, but collects, manufactures, and sells their dairy products to the best advantage possible, accounting to them for the proceeds. The sales proceeds are handled by the petitioner in the following manner: After the end of each month the expenses of the preceding month are estimated and deducted from the gross proceeds of sales made that month; there is also deducted an amount, usually $2,000 or $3,000, which is used for working capital. Special amounts have also been withheld. On one occasion, 1 cent per pound of butterfat was withheld to provide funds to build a condensary; *192 and on another occasion 3/8th cent per pound of butterfat was withheld to repay a mortgage. The remainder of the estimated gross proceeds is turned over as an advance to the producers on the basis of the butterfat content of the milk and cream delivered by them. The amounts retained by the petitioner vary from month to month by reason of market conditions, the Association's need for money, and competitive conditions. The petitioner operates in a highly competitive field and the advances made are gauged by the market price set by this competition. As an aid against the competition, the petitioner aimed to give its members better service, and to create a higher market price by reason of being in business for its members. The amounts withheld from gross sales by petitioner, known as "members' retains" or "members' equities," were reflected in an account called Members' Retains Account or Members' Equity Account. At the end of each year when the books are closed, entries are made reflecting the sums withheld from all members and also any overdistribution to members. This information is entered by years from the beginning of the Association. No liability accounts were set up showing *193 in dollars and cents the credit to each individual member. However, a card record account was kept for each member, known as his capital account. On these cards was entered month by month the amount of butterfat shipped by a member, and from them each individual's interest in the Retains Account was readily computable at any time. The petitioner operates on the revolving fund system, which it adopted in 1924. Under this system, the amounts withheld from the members are retained by the petitioner for a number of years, for use as working capital and for the special purposes above mentioned. In a later year, the amounts so withheld are to be returned to the members on a patronage basis, out of earnings of the current year. It was hoped that these distributions could be begun in 1929, but because of economic conditions, the petitioner was financially unable to do so. In 1931 petitioner had become hard pressed for money, and in order to establish its credit with the banks more securely, the directors passed a resolution at the February 1931 meeting, declaring the petitioner's liabilities to its general creditors to be prior to the claims and liabilities of members, and that the latter *194 be "subject and subordinate to the obligations and liabilities on account of non-member creditors." By 1934 financial conditions had improved. Resolutions were adopted to issue memoranda to each member of his butterfat deliveries by years; to pay an equity as finances justified beginning with 1 cent per pound of butterfat delivered during the last seven months of 1924; and that the Association distribute the retains on a revolving basis, beginning with the year 1924, distribution to be made in such amounts and at such times as determined by the board of directors. Since that time more or less regular distributions have been made to the members. In practice, no exact distribution has ever been made. The amounts authorized to be distributed have been determined by the amounts on hand available for that purpose and such amounts have been distributed to the petitioner's members, pro rated according to the amount of butterfat delivered by each in the year for which the distribution was made. The amounts so distributed have always been less than the amounts withheld, but it was the petitioner's plan to distribute these unpaid balances as soon as sufficient funds were available for that *195 purpose. No distributions were made except by formal authorization by the petitioner's board of directors. In 1936 a resolution was passed authorizing a distribution of retains for the years 1927 and 1928. These years were joined because the year 1927 showed a deficit, that is, there had been an overdistribution to members during that year. In such circumstances, it is the petitioner's practice to make a two-year distribution period, charging against the member the amount that he was overpaid in the overdistribution year, and taking it out of the retains due him for the following year. This is the usual procedure among cooperatives operating on the revolving fund system, and it is the only feasible way of collecting back the overdistribution. An overdistribution was made in 1930 and for this reason, 1930 was combined with 1929, and distributions for both years were authorized by the directors in 1939. Members were kept fully advised of the affairs of the Association. Both annual meeting and special regional meetings were held at which the matters of "retains" and "members' equities" and the distribution thereof upon a revolving fund basis were discussed, and special retains from *196 time to time authorized. Each member received a monthly statement, disclosing the amount of butterfat delivered to the Association by him during that month. Annual financial statements were distributed to all members. These statements showed the total members' retains and broke them down into such accounts as "special retains," "retains authorized for distribution, but uncalled for" and "undistributed retains." In addition, letters were sent to the members from time to time informing them of the activities of the Association. These letters referred to meetings held or to be held, the non-profit nature of the Association, and the need for retains to provide capital, the revolving fund plan of handling members' retains, and the actual distribution of the same. In 1925, the petitioner began to handle the produce of non-member producers as well as that of member producers. The same amounts were withheld from the non-members as were withheld from the members, and were likewise reflected in the Members' Retains Account. However, the non-members were not entitled to any part of the amounts so withheld. A differential of one-half cent less per pound of butterfat was also paid to the non-member *197 producers. The petitioner has been indebted for funds used in its operations in large sums during the entire period here involved. Funds borrowed from lending agencies, however, have proved inadequate for all needs, including a "margin of reserve for safety," and additions to its fixed assets, such as plant and equipment. For this latter purpose the petitioner has required some $800,000 over the 15-year period in question. During the same period it invested in the Challenge Cream and Butter Association, a cooperative organization of which the petitioner is a member, about $160,000; has made payments to the Berkeley Bank for Cooperatives on a mortgage aggregating $175,000; and, in addition, it has built up a certain amount of working capital. All these items were covered by amounts carried in the Members' Retains Accounts. In 1922 the petitioner applied for and received an exempt status as a cooperative under section 231 (11) of the Revenue Act of 1918. In 1925 the petitioner notified the Commissioner that it was transacting business with non-members to the extent of 14 per cent of its gross business on a basis different from that of its members. The petitioner had no notice of a *198 change in its status until 1937, when it received a letter stating that the Bureau of Internal Revenue had ruled that the corporation was not entitled to exemption from income taxes, and it was, therefore, necessary for it to file a capital stock return. In 1939, its status as an exempt corporation was formally revoked. The petitioner then filed income and excess profits tax returns for the years 1925 through 1939. In these years it reported as taxable income only the sums which it had withheld from the proceeds arising from the sale of non-members' produce. It computed this amount on a percentage basis, taking that percentage of the total amounts credited to the Members' Retains Account which the business transacted with non-members for each year bore to the entire business transacted during such year. The respondent determined that the amounts withheld from the members constituted income taxable to the petitioner also, and determined the deficiencies above noted. The amounts in question, which admittedly arose from the member business and which were credited to the Members' Retains Account during the respective years involved, are as follows: Year
Amount
1925
$ 68,720.75
1926
54,868.36
1928
74,632.00
1929
16,934.56
1931
38,362.40
1934
76,287.61
1935
60,047.46
1936
55,045.95
1938
(loss)
1939
122,307.59
*199 These amounts were included in the petitioner's gross sales for all the years involved and were claimed as "other deductions" on the returns filed by it for all of the said years but 1939. On the return filed by the petitioner for 1939, the sum of $122,307.59 was claimed as a cost of goods sold. The petitioner kept its books and prepared its return on an accrual basis. The amounts in question do not constitute income of the petitioner. Opinion ARUNDELL, Judge: The petitioner contends that the funds sought to be taxed are not its income, but are the property of its members; in the alternative, the petitioner argues that the funds constitute deferred patronage dividends which are properly excludible or deductible from its gross income as part of the cost of sales. The respondent contends that the amounts in question are the income of the petitioner and that it is not entitled to any deductions for these amounts. It is our opinion that the case before us is indistinguishable from that of , recently decided by the Circuit Court of Appeals for the Ninth Circuit. In *200 that case the taxpayer was organized as a nonprofit cooperative association under Title XXIII, Part IV, Division I of the Civil Code of California. Its articles of incorporation stated that it was formed to engage in any activity in connection with the marketing, selling, packing, grading, storing, handling, or utilization of any poultry, eggs, or other agricultural products, produced or delivered to it by its members, or any activity in connection with the purchase, hiring, or use by its members of supplies, machinery or equipment. The articles provided that the association should "conduct and carry on its business without profit to itself." The by-laws provided that its purpose was "to provide for its members a collective system of marketing poultry, poultry products and other agricultural products, to furnish to them any fee, seed or supplies and, to the end of lessening the cost of such service, to do the same things for those who are not members;" that it was organized as a nonprofit cooperative organization; and that the net proceeds resulting from the operation of the business, if any, should belong to the members and should be pro rated to them in proportion to the amount of *201 business each member had transacted with the Association. Three reserves were established by the Association's board of directors: A "reserve for overpayments," a "reserve for security of the membership fund," and a "reserve for zoning hazard." The moneys placed in these reserves were taken from and were a part of the "net proceeds" resulting from the operation of the taxpayer's business. It was these sums which the Commissioner sought to tax. The Court held that the sums so placed in the reserves were not the income of the Association saying: The sums so placed in these reserves * * * never became the property of petitioner, but were and are the property of the members. . See, also, ; . To hold otherwise would be to hold that petitioner could and did "make a profit for itself, as such," in contravention of *202 its by-laws, its articles of incorporation and the statute to which it owes its existence. Petitioner never pretended to be the owner of these sums, but as required by its by-laws, "prorated" and credited them to its members. The fact that the sums were not payable to the members on demand, or at any fixed time, does not alter the fact that they were their property and not petitioner's. Petitioner held them, not as owner, but as agent, or trustee for the members. Since none of the sums ever belonged to petitioner, they could not be, and were not, income of petitioner. Similarly, in the instant case, the petitioner's articles of incorporation and its by-laws provide that "this Association is organized for purposes of mutual help, without capital stock, to serve its members only and provide all of its facilities to them at cost, pro rated according to volume and value of business done, upon uniform rules and regulations to be prescribed by the directors of the Association." The preamble *203 to the petitioner's by-laws likewise provides that it is a cooperative nonprofit corporation, without capital stock and not conducted for profit. There is no provision in either its articles of incorporation or its by-laws under which the petitioner could accumulate earnings. Its purpose is nonprofit, to provide its facilities to its members at cost. Therefore, all of the income, with the exception of that needed to defray current expenses, is the property of its members, and it is under a direct liability to refund those sums to them. The respondent seeks to distinguish the case at bar from the San Joaquin Valley Poultry Producers' Assn. case, supra, upon the asserted ground that in the present case, unlike the San Joaquin case, the amounts in question were neither required by any by-laws, regulations, or proven agreements of any kind, currently to be credited to the individual members on the books of the corporation, nor were they so credited during any of the years in question. We think this distinction is without merit. The amounts in question were credited to the general retains account in terms of dollars and cents, and accurate records were kept for each member, *204 showing the amount of butterfat delivered by each member to the corporation. Therefore, it required only a mathematical computation to determine at any time the interest of each individual member in the General Retains Acount. The liability to the members was present and existing, and the method adopted by the petitioner to show that liability on its books could in no way, nor, in fact, did it in any way lessen the amount of that liability. The respondent seeks further to distinguish the San Joaquin case upon the ground that the petitioner here, unlike the petitioner in that case, was never governed by the Agricultural Code of California, but, after 1931, at least, was an ordinary corporation, governed by the general corporation law of California, with all the powers incident to ordinary business corporations. If it be assumed that after 1931 the petitioner was granted broader powers by the State of California than it had theretofore possessed, this does not alter the fact that under its articles and by-laws, which were a part of its contract with its members, the petitioner was still obligated to furnish its service to its members at cost. It could not, therefore, make a profit *205 for itself after 1931, any more than it could before 1931, without violating this contract. Furthermore, it does not appear that the respondent is wholly accurate in his statement that after 1931, the petitioner was no more than an ordinary business corporation. Section 279 of the General Corporation Law of California provides: The provisions of this title are applicable to every private corporation, profit or non-profit, stock or non-stock, now existing or hereafter formed * * *. From this it appears that the general corporation law, while made to apply to all corporations, both profit and non-profit, did not operate to change their respective individual natures. It follows that the instant case is controlled by , and that respondent erred in his determination. In view of our conclusion, it is unnecessary to discuss the petitioner's alternative contention. Decision will be entered under Rule 50.